IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-4050-01-CR-C-SOW |
| | ) | |
| RANDY GENE TETER, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Before this court are the May 29, 2007 pro se motion of defendant Randy Gene Teter, Jr., to suppress incriminating statements and handwriting sample, and August 23, 2007 amended motion to suppress all evidence, including finger and palm prints. The Government has responded in opposition to the motions. A hearing was held on the motions on October 11, 2007, and then continued on October 25, 2007.[1]

### I. Findings of Fact

The credible evidence presented at the hearings establishes that on March 3, 2005, the Federal Bureau of Investigation (FBI) office in Washington received a letter threatening FBI Director Robert Muller and the FBI Hoover Building. The letter stated that "I am a[n] x-member and ranger real name Randy Teter who is at Jefferson City Correctional Center. . . ." The letter went on to identify an attached hit list, and provided that Teter would give information on who was going to get hit and why. The letter was signed by "Red Eagle," with the statement that "I am using Teter's partner's name," as identified on the return address, and cited Teter's partner as a nonmember of the organization "White Dragon" "run" by Teter. The return address on the letter was that of Kenny Rawls at Jefferson City Correctional Center (JCCC). Attached to the letter to Muller was a copy of two letters directed to "Red Eagle" from "Ranger." The two letters, among other threatening statements, discussed "taking out" the FBI Hoover Building and

---

[1]This case was referred to the undersigned United States Magistrate Judge for processing in accord with the Magistrate Act, 28 U.S.C. § 636, and L.R. 72.1.

Robert Muller. The attached hit list for 2005 cited ten persons and/or buildings. Included in the hit list were former President Bush, President Bush, and Vice President Dick Cheney. In response to threats being made against numerous governmental officials, including the President, the Secret Service assigned an investigator, Special Agent Ryan of Kansas City, Missouri, to investigate the case.

On March 14, 2005, the FBI received a second threatening letter. The envelope's return address was Randy Teter at JCCC in Jefferson City, Missouri. The envelope was addressed to the Director of the FBI, Robert Muller. That letter was dated March 1, 2004, and made specific threats against Robert Muller and Missouri Governor Blunt. The letter also stated that if Muller wanted to save some lives, he and some agents could come and have a meeting with him (Teter) and he would tell Muller "what ever you want to know." Teter's letter went on to state that if he didn't hear from Muller by the fifteenth of the month, three innocent men would die. The letter finished with the statement that Red Eagle had already told the FBI that he (Teter) was sore, and that time was wasting. The letter was signed by Ranger, Randy Teter, JCCC, Jefferson City, Missouri.

On March 15, 2005, Secret Service Agents Steve Ryan and Paul Chomicki interviewed inmate Teter and fellow inmate Kenneth Rawls at JCCC. On March 22, 2005, Agents Ryan and Chomicki reinterviewed Teter and Rawls, and additionally, for the first time, interviewed inmate Herbert Shackleford. Shackleford was interviewed based on information that he was associated with Teter. The following day, on March 23, 2005, Agents Leggans and Ryan requested Teter, Rawls and Shackleford have their finger and palm prints, photographs and handwriting samples taken, to which all three consented.

During the March 15, 2005 investigative interview with Teter, he admitted writing the hit list, but denied sending the envelope to the FBI. During the March 22, 2005 investigative interview, Teter again made some admissions. During the March 15 and 22, 2005 investigative interviews, Teter was not given <u>Miranda</u> warnings.

During the interviews with Teter on March 15 and 22, 2005, and on March 23, 2005, when Teter's finger and palm prints, photograph and handwriting samples were taken, the agents were only aware of the first letter received on March 3, 2005, and were not aware of the second letter received on March 14, 2005, by the FBI. It was not until April 4, 2005, that Agent Ryan

2

was made aware of this second letter which was specifically signed by Teter and requested that agents be sent to interview him.

During the investigative interviews on March 15 and 22, 2005, the agents told Teter that a threatening letter against United States Government officials could constitute a serious crime and advised him to quit sending such letters. Despite such warning, the agents were advised in the weeks and months to come of several additional threatening letters received from Teter.

Teter became the sole focus of the Secret Service's investigation, and on July 8, 2005, Agents Ryan and Fotenos again went to speak with Teter. Prior to asking Teter questions, the Miranda warning was given to Teter by the agents. Agent Ryan read the rights to Teter out loud and Agent Fotenos was a witness. After being read the Miranda warning, Teter signed a form stating that he had read the statement of his Miranda rights and that it was read to him, and that he understood what his rights were. On the same form, Teter also signed a voluntary waiver of his rights, and indicated that he was willing to make a statement and answer questions. On the bottom of the form was a certification that was signed by Teter and witnessed by both Agents Ryan and Fotenos. During this interview, Teter made incriminating statements, including the sending of previous letters. Teter also made a verbal threat to harm several governmental officials, including the President and Vice President of the United States.

The Government's forensic experts are of the opinion that Teter authored all the letters, and his prints were matched with those found on the letters.

## II. Miranda

Miranda v. Arizona, 384 U.S. 436 (1966), established a rule of law providing that statements obtained from a defendant during a custodial interrogation without full warning of constitutional rights are presumed inadmissable as having been obtained in violation of the Fifth Amendment privilege against self-incrimination. A person may waive his constitutional rights as provided in a Miranda warning so long as the waiver is made voluntarily, knowingly and intelligently.

## III. March 15 and 22, 2005 Interviews

In the instant case, because Teter was already incarcerated at JCCC, the questions asked by the agents at the March 15 and 22, 2005 interviews constituted a custodial interrogations for purposes of the Miranda rule. Despite qualifying as custodial interrogations, however, Teter was

3

not given the Miranda warning at either of the March interviews.  Additionally, no exception to the Miranda rule was applicable.  The exception argued by the Government, providing that when a suspect requests to speak to law enforcement officials a Miranda warning is not required, does not fit the facts in this case.  See United States v. Koontz, 143 F.3d 408, 411 (8th Cir. 1998) (holding in-custody defendant, who sent message to law enforcement asking to talk to federal drug agent, was not subjected to interrogation when the agent subsequently asked questions, and thus, a Miranda warning was not required).

The facts in this case provide that although Teter's letter received by the FBI on March 14, 2005, requested federal agents to come interview him and that he would tell them whatever they wanted to know, the agents did not become aware of his letter until April 4, 2005, after the March interviews.  Thus, during the March interviews, the agents were not present questioning Teter based on his request.

The Fifth Amendment prohibits use of compelled testimony by the prosecution in its case-in-chief.  United States v. Patane, 542 U.S. 630, 637-38 (2004); Oregon v. Elstad, 470 U.S. 298, 306-07 (1985).  However, in order to protect a suspect's Fifth Amendment rights, the Miranda rule creates a presumption that, in the absence of specific warnings in custodial interrogations, statements made by a suspect are the result of compulsion, and thus, inadmissable for purposes of the prosecution's case-in-chief.  Patane, 542 U.S. at 639; Elstad, 470 U.S. at 307.

In the instant case, this court finds that because the March 15 and 22, 2005 interviews with Teter were custodial interrogations under the Miranda rule, and Teter was not given the Miranda warnings; statements made by Teter at these interviews are not admissible in the prosecution's case-in-chief.  However, this court also finds the statements made at the March 15 and 22, 2005 interviews were not compelled, but were voluntary.  The voluntariness of Teter's statements is evidenced, in part, by the letter sent by him, and received by the FBI on March 14, 2005, prior to the agents' initial interview with him.  This letter clearly stated Teter's desire to provide information to the Government, and specifically requested that governmental agents be sent to interview him.[2]  The fact that the agents were not aware of the letter received by the FBI

---

[2]The March 15, 2005 threatening letter received by the FBI was signed by Teter and the return address provided his name and JCCC address, thus providing a fairly clear indication that

4

on March 14, 2005, until after the two March interviews with Teter were already conducted does not detract from the fact that the letter is evidence that Teter desired to talk to governmental agents and provide information regarding the threats being made. Teter's testimony that he wanted to end the March interview is not credible. Furthermore, Teter's own witnesses, two correctional officers who escorted him to the interview rooms at JCCC from his housing unit, testified that had Teter wanted to end the interviews with the agents, he could have, at any time, simply gotten their attention in some manner because they were posted just outside the interview room door, containing a glass window, and they would have taken him back to his housing unit. The credible testimony of the agents provides that while Teter, several times during the interviewing, would stand up because he became agitated, at no time did Teter go to the door and try to obtain the guard's attention to leave. Rather, each time Teter stood up, he would subsequently settle himself and sit back down. Voluntary statements made by Teter do not violate the Fifth Amendment. See Patane, 542 U.S. at 639-40. Therefore, this court finds that such statements can be used by the prosecution to impeach Teter at trial. Elstad, 470 U.S. at 307; Patane, 542 U.S. at 639-42.

### IV. July 8, 2005 Statements

Prior to being questioned on July 8, 2005, Teter was given the Miranda warning by Agents Ryan and Fotenos. The credible testimony of Agents Ryan and Fotenos indicates that Teter was read his Miranda rights, and then the agents witnessed Teter sign a Miranda warning form which provided that he understood his rights, was waiving his rights, and he was willing to make a statement and answer questions. Teter's testimony acknowledges being read his rights by the agents, his reading the Miranda form in its entirety, and his understanding that he didn't have to talk to the agents. Teter's further testimony that although he signed the Miranda warning form on the top, acknowledging he understood his rights, and on the bottom certification, but that the signature in the middle of the form (which sets forth a waiver of his rights) is not his signature, is just not credible. The middle signature matches the top and bottom signatures on the form, and was witnessed by Agents Ryan and Fotenos. Moreover, Teter's testimony that he

---

Teter was the author of the letter. Additionally, the court notes that subsequent forensic tests confirmed Teter to be the author.

"does not recall" waiving his rights and answering subsequent questions by the agents on July 8, 2005, is also not credible. Rather, the credible evidence is that after knowingly waiving his rights, Teter voluntarily answered questions by the agents, and made additional threats against the President, Vice President, and other governmental officials, and admitted to sending previous threatening letters. Thus, all statements made by Mr. Teter at the July 8, 2005 session are admissible unless excluded for some other reason. They were voluntary and made after a knowing and voluntary waiver of all rights.

Teter's argument that the July 8, 2005 interview was tainted by the two previous interviews by the Secret Service months earlier in March 2005, and thus, should be suppressed as fruit of the poisonous tree is without merit.

A failure to give the Miranda warning does not itself violate a suspect's constitutional rights. Patane, 542 U.S. at 641. Although a technical violation of Miranda occurred when the agents, without providing the Miranda warnings, questioned Teter while he was "in custody" at JCCC on the two occasions in March 2005, this court finds these interrogations did not taint or make the July 8, 2005 subsequent interview a "fruit of the poisonous tree." This case is not similar to the Missouri two-step described in Missouri v. Seibert, 542 U.S. 600 (2004).

The Miranda rule of law is a prophylactic employed to protect against violation of the Self-Incrimination Clause of the Constitution. Patane, 542 U.S. at 636. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the fruit of a voluntary statement, even if such a statement was made without the protections required by Miranda. Id. Thus, although there is a presumption that statements made while in custody in response to questions asked by law enforcement officers without the protections of Miranda, are the result of coercion and must be excluded from the Government's case-in-chief, voluntary statements obtained in technical violation of Miranda, but without an actual violation of the Self-Incrimination Clause, do not taint the subsequent fruits of such statements. Id. at 637-42. Fruits of such voluntary statements can include subsequent statements given with the Miranda warning and/or resulting physical evidence. Id.

Because this court finds that the statements made by Teter in March were voluntary, the March interviews cannot taint the July 8, 2005 interview as being "fruit of the poisonous tree." Teter's voluntary statements did not violate his rights under the Self-Incrimination Clause of the

6

Fifth Amendment, and therefore, the failure of the agents to give Teter his Miranda warnings is only a technical violation of the Miranda rule. As set forth above, technical violations of Miranda, because they do not actually violate the Fifth Amendment, do not implicate exclusionary rules such as "fruit of the poisonous tree."

Seibert, decided by the Supreme Court on the same day as Patane, is not comparable. In Seibert, the Court was addressing the technique of interrogating in successive, unwarned and warned phases by law enforcement. Specifically, the interrogation practice involved intentionally withholding the Miranda warning until after the interrogation succeeded in eliciting a confession, and then subsequently, within a short period of about 15-20 minutes, the officer would then give the Miranda warning and attempt to illicit the same confession. The Court held that when "Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Seibert, 542 U.S. at 613-14. "Upon hearing the warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." Id. at 613. The Court in Seibert set forth relevant facts that bear on whether Miranda, delivered midstream, could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the statements, the timing and setting of the interviews, the continuity of police personnel, and the degree to which the interrogator's questions treated the subsequent interview as continuous with the first. Id. at 615.

In the instant case, although there appears to be some overlap between the July 8, 2005 interview and the two March 2005 interviews with regard to where the interviews were conducted, the agents who conducted them, and the statements made by Teter, this court finds that the overlap was not identical, and does not provide a basis for finding that the agents, in this case, employed a strategy to undermine the Miranda warning. See id. at 616-17. The court finds that the substantial break in time (of more than three months between the March and July interviews) made the Miranda warning given at the July 8 interview effective in presenting a

7

genuine choice to Teter of whether to follow up on any earlier admissions made. See id. at 616-17. Mr. Teter is not a novice when it comes to knowledge of his legal rights.

## V.  Finger and Palm Prints, Handwriting Samples and Photographs

The core protection afforded by the Self-Incrimination Clause of the Fifth Amendment is prohibition on compelling a criminal defendant to testify against himself at trial. Elstad, 470 U.S. at 304; Patane, 542 U.S. at 637.  The Fifth Amendment does not concern physical nontestimonial evidence. Id.  Thus, the agents' obtaining finger and palm prints, handwriting samples and photographs from Teter, which are physical nontestimonial evidence, does not implicate the protections of the Fifth Amendment or the Miranda rule.  See United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (quoting United States v. Villalba-Alvarado, 345 F.3d 1007, 1008 (8th Cir. 2003) ("The Fifth Amendment's Self Incrimination Clause offers no protection against compulsion to submit to fingerprinting.")).

To the extent Teter argues the finger and palm prints, handwriting samples, and photographs were obtained as a result of his statements made at the March 2005 interviews, where he was not given his Miranda warnings, and therefore should be excluded under the Fifth Amendment as "fruit of the poisonous tree," this argument is without merit.  As discussed previously in this report, suppression of physical evidence is not required or warranted when the physical evidence is the fruit of a voluntary statement. Patane, 524 U.S. at 634.  Therefore, because this court has found that Teter's statements given during the March interviews were voluntary, the "fruit of the poisonous tree" exclusionary rule is inapplicable.

To the extent the taking of defendant's photographs, finger and palm prints, and handwriting samples could be construed as protected under the Fourth Amendment, this court finds there was no violation.  Based on the totality of circumstances, the credible testimony shows, by a preponderance of the evidence, that the agents reasonably believed Teter voluntarily consented to provide his finger and palm prints, writing samples and photographs.  A warrantless search does not violate an individual's Fourth Amendment rights if consent to the search is given voluntarily.  United States v. Almendares, 397 F.3d 653 (8th Cir. 2005).  Moreover, the court notes that, pursuant to United States v. Dionisio, 410 U.S. 1, 14 (1973), compelled voice recordings and handwriting examples are not protected by the Fourth Amendment.  The Court ruled that the Fourth Amendment provides no protection for what a person knowingly exposes to

8

the public, even in his own home or office.  Id.  Thus, pursuant to Dionisio, because Teter regularly exposes to the public his face, as well as his finger and palm prints and handwritings, these are not protected by the Fourth Amendment.

This court, therefore, finds the taking of Teter's finger and palm prints, handwriting samples and photographs did not violate his rights under the Fifth or Fourth Amendments.

### VI.  Conclusion

IT IS, THEREFORE, RECOMMENDED that defendant Teter's motions to suppress be granted, in part, and denied in part.  [40, 60]  It is further

RECOMMENDED that defendant Teter's motions to suppress be denied as to his statements made at the July 8, 2005 interview; on his finger and palm prints, handwriting samples and photographs; and statements made at the March 15 and 22, 2005 interviews for use by the prosecution for purposes of impeachment at trial.  It is further

RECOMMENDED that defendant Teter's motions to suppress be granted as to statements made at the March 15 and 22, 2005 interviews for purposes of the prosecution's case-in-chief.

Under 28 U.S.C. § 636(b)(l), the parties may make specific written exceptions to this recommendation within ten (10) days.  If additional time is needed, a motion for an extension of time must be filed within ten days.  The motion should state the reasons for the request.  See Nash v. Black, 781 F.2d 665, 667 (8th Cir. 1986) (citing Thomas v. Arn, 474 U.S. 140 (1985)); Messimer v. Lockhart, 702 F.2d 729 (8th Cir. 1983).  Failure to make specific written exceptions to this report and recommendation may result in a waiver of the right to appeal.

Dated this 20th day of December, 2007, at Jefferson City, Missouri.

/s/ *William A. Knox*

WILLIAM A. KNOX
United States Magistrate Judge